· No. 25,908.

MARY RIGHTMIRE, *Appellant,* v. PORTER RIGHTMIRE and MILTON RIGHTMIRE, Executors, etc., et al., *Appellees.*

SYLLABUS BY THE COURT.

WILLS—*Consent of Wife—Evidence.* In an action to set aside consent to a will, various assignments of error considered and held not to be of substantial merit.

Appeal from Pottawatomie district court; MARTIN A. BENDER, judge. Opinion filed June 6, 1925. Affirmed.

*W. F. Challis,* of Wamego, *Hal E. Harlan,* and *A. M. Johnston,* both of Manhattan, for the appellant.

*A. E. Crane,* and *B. F. Messick,* both of Topeka, for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to set aside consent to a will. The defendants prevailed, and plaintiff appeals.

The grounds upon which plaintiff sought to have her consent set aside were that at the time of the execution of the will, May 4, 1907, she was, and ever since has been, blind and unable either to read or write; that the will was never read to her nor in her presence, nor its contents made known to her until after the death of her husband; that she at no time, either knowingly or advisedly, consented to its terms; that if her name appeared to such consent, it was not knowingly signed or executed by her; that she at all times expected and desired the widow's share of her husband's estate provided by law, in the event of his death. She asked that her alleged consent be set aside and that she be permitted to make her election, as the widow, under the law.

The facts are well stated in the court's findings, which read:

"1. The court finds: That about the year 1876, the plaintiff, then Mary A. Drake, a widow, and Louis C. Rightmire, a widower, were united in marriage in Knox county, Ohio. That each had been previously married, and Louis C. Rightmire had four children by such former marriage, viz., Milton Rightmire, James Rightmire, Emma Townsend and Porter Rightmire, defendants; and plaintiff had two children by said former marriage, viz., Charles Drake and Edgar Drake; all of said children being minors at the time of said marriage except Milton Rightmire.

"2. That at the time of the marriage of said parties the said Louis C. Rightmire owned a farm in the state of Ohio and the plaintiff owned a one-half interest in a farm in Pottawatomie county of 120 acres, and her said sons,

Charles and Edgar, owning the other half thereof, the same coming to them by descent, and that the plaintiff at the time of said marriage also had some personal property, the amount of which is not disclosed by the evidence. That after said marriage the said Louis C. Rightmire also received from his father certain money, the amount of which is not disclosed by the evidence.

"3. That in the year 1878 the parties removed from the state of Ohio to the state of Kansas and occupied the 120 acres of land owned by the plaintiff and her children. The said Louis C. Rightmire while living on said land used the same as if it was his own, no accounting being made to the owners thereof, and that by the combined efforts and frugality of the parties, both being industrious, the property in controversy was accumulated.

"4. That a short time after removing to the state of Kansas the two Drake children each inherited the sum of $500, which was taken possession of by the said Louis C. Rightmire, and by him used until after the marriage of Edgar Drake, when the whole sum of money so received was paid to the said Edgar Drake, the said Charles Drake having in the meantime died a minor.

"4½. That during the time plaintiff's land was occupied by her and her husband, Louis C. Rightmire made improvements upon said land, and prior to the execution of the will in controversy said land was deeded to the son of plaintiff, Edgar Drake, without consideration.

"5. About the year 1905 the testator, Louis C. Rightmire, and plaintiff left the farm and moved to Wamego, purchasing the residence mentioned in the will as devised to her son, Edgar Drake, where they resided until the death of her husband, on January 21, 1923.

"6. That the defendant, Porter Rightmire, removed to the farm of Louis C. Rightmire and made his home thereon until the death of his father, the testator, and during such time he gave his father one-half of the proceeds of the farm and pasture land.

"7. That after the removal of the said Louis C. Rightmire and his wife to Wamego, the eyesight of both of them began to fail and continued to grow worse, until at the date of the death of the said Louis C. Rightmire both he and his wife were practically blind. That in 1907, at the time of the execution of the will in controversy, the eyesight of the plaintiff, Mary Rightmire, had so failed that she could only discern large objects. That the parties had a great deal of affection for each other, and with their common affliction their delight was in each other.

"8. That on or prior to the 4th day of May, 1907, one B. H. Tracy, an attorney in Wamego, was engaged (but the evidence does not disclose by whom) to draw the last will and testament of the said Louis C. Rightmire; that after the will was written or copied by the stenographer of B. H. Tracy, viz., Mabel Townsend, she took the same to the residence of the testator and the plaintiff, where the same was signed by the said Louis C. Rightmire, and the consent thereto executed by the plaintiff making her mark thereto, all in the presence of said Mabel Townsend and one F. E. Rowles; that at said time the will was not read or explained, the testator merely saying, 'We had as well sign this up (the will); we are all here.' B. H. Tracy, who drew said will, died before the said Louis C. Rightmire.

"9. That after the execution of the will as stated in the preceding finding,.

the witness Rowles remained at the home of the testator and the plaintiff for a short visit, they being old friends, and during such time the provisions of the will that had just been executed were discussed by the three of them, the plaintiff saying, among other things, that 'they had left it the way they wanted it fixed, . . . and if I had fixed the property ·I would have done it that way.' That the plaintiff never saw said will again until after the death of said testator, but upon various occasions and upon numerous times stated the material contents of the will of her said husband to divers persons, and that she at all times knew that she was entitled by law to one-half of the property of her husband upon his decease, and from the circumstances surrounding the drawing and the execution of said will and the conduct of the plaintiff, the court finds that the plaintiff knew and understood the contents and provisions of the will of the testator and knowingly and voluntarily executed her consent thereto, though she repeatedly testified that she had no knowledge of said will until after the death of her said husband.

"10. At the date of the death of the testator the plaintiff was eighty-five or eighty-six years of age, blind and helpless and quite enfeebled, and after the death of her said husband, stated that the defendant, Porter Rightmire, was going to take care of her, and she knew she would be taken care of.

"11. That the will in controversy was duly admitted to probate by the probate court of Pottawatomie county, Kansas, and the consent of the will admitted and approved by the court.

"12. The court finds for the defendants, Porter Rightmire and Milton Rightmire, as executors of the estate of Louis C. Rightmire, and as to each of them individually, against the plaintiff."

The plaintiff complains that she was not permitted to testify to the negative proposition that she did not knowingly execute the consent to the will, and that the court predicated its final judgment against her on the theory that no competent evidence had been introduced by her, impeaching the consent; therefore the rejection of the evidence was prejudicial to her rights.

While we find that answers to certain questions asked the plaintiff touching this point of the controversy were excluded, there was sufficient evidence received from her to show, beyond question, that she denied having any knowledge of the provisions of the will; that its provisions were not explained to her; that she never heard the will read before the death of her husband, and that no one ·informed her of the execution of the will and its contents on the day of its execution; that she did not recall signing the consent to the will and did not hear of it until after her husband's death. The rejected evidence covered substantially the same ground as other evidence which was admitted and considered by the court. We are of opinion that the excluded evidence would have been cumulative only, and if ad-

mitted would not have affected the findings of the court. There was other testimony.

Mrs. Jack Finlinson testified:

"Q. Did you see your grandmother, Mary Rightmire, sign the will. . . .? A. Yes.

"Q. At whose request, if you know, did she sign or make her mark thereon? A. My grandfather asked her to sign.

"Q. At that time did she ask any question regarding what the will contained? A. No.

"Q. Did she say anything when your grandfather asked her to sign the will? A. No.

"Q. When you went over there, you went over for the purpose of signing this will? A. Yes.

"Q. Your grandmother knew, did she not, that you were there for that purpose? A. I presume that she did.

"Q. She was of sound mind at that time, was she not? A. Presumably.

"Q. And her intellect was quite as active as any one of her age would be, was it not, at that time? A. Yes."

F. E. Rowles testified:

"Q. I will ask you if at the time you saw Mary Rightmire there and saw her make her mark? A. Yes.

"Q. Was that made in your presence? A. Yes.

"Q. And in the presence of Mabel Townsend? A. All of us."

"A. They were all talking about the will, and Mr. and Mrs. Rightmire said they had fixed their property.

"The Court: State what Mr. Rightmire said and what Mrs. Rightmire said.

"A. Louis C. Rightmire said they fixed the property as they wanted it left. He said the house and lots in town were left to Ed. Mrs. Rightmire said the farm went to Ed—the Drake property. Mr. Rightmire said the house and lots there went to Ed and some money, did not state how much money; and the land, the other property, went to the Rightmire children. Mrs. Rightmire said they had left it the way they wanted it fixed and Ed shared in the Rightmire property and got the Drake property in addition, and I said if I had fixed the property I would have done it that way."

Other evidence need not be quoted. We conclude it was sufficient to support the findings of the court.

The will was executed in 1907. By its terms Milton Rightmire was given a quarter of land valued at $7,000, which was charged with a payment to Emma Townsend of $3,500. Milton was also chargeable with paying to the plaintiff, Mary A. Rightmire, the sum of $200 a year during her lifetime. Porter Rightmire was given three quarters of land as his share of the property, but was chargeable with making certain payments to others. He was to give James Rightmire, his brother, $3,500, and to Edgar Drake, plaintiff's son,

Rightmire v. Rightmire.

$1,500. He was also chargeable by the terms of the will of making payment of $200 a year to Mary A. Rightmire during her lifetime.

The will further provided for the erection of a suitable tombstone, and all necessary expenses of administration to be paid out of his personal property, and if any was left it was to go to Porter Rightmire. It was further provided in the will that Porter Rightmire was to pay at the death of Mary Rightmire, if she survived Lewis C. Rightmire, all the expenses of her last illness and of her funeral and for the erecting at her grave of a suitable tombstone. Porter Rightmire paid the expenses of the last sickness and funeral of Lewis C. Rightmire, amounting to $700. Edgar Drake received lots Nos. 644, 645, and the north 40 feet of lot 646 in the original townsite of Wamego, also all of her property in Wamego, by deed, of the value of $2,500. In addition to that he is to receive $1,500 from Porter Rightmire. Edgar Drake received more from the estate of Lewis C. Rightmire than any of the children of the deceased, except Porter, and in addition, all of his mother's estate. A controversy between the children of the plaintiff and the children of her deceased husband appears to have been the basis of the present action. It was brought by Edgar Drake, who was vested with a power of attorney executed by the plaintiff a few nights after her husband's death.

The following evidence illuminates the situation.

Mrs. Maronde: "They had grandmother (plaintiff) sign a paper. Edgar Drake, Mr. Challis and Gene Klinginsmith were present. . . . After they were gone she said she did not know what she had signed and wanted me to telephone for Porter Rightmire."

Mrs. Porter Rightmire: "We got a telephone (message) and went down to the home of Mary Rightmire. . . . Porter asked her if Challis, Klinginsmith and Drake had been there, and she said 'yes.' She said she did not know what she had signed. She wanted Porter to get the paper and bring it back to her. He was to get the paper in the morning."

Porter Rightmire: "On that night she told me she did not know what she had signed. She wanted me to find out what it was, and I went to Edgar and he read it to me. It was a power of attorney. I asked him to take it to his mother and read it to her."

Mrs. Mary Rightmire: "I do not remember the night of January 31, 1923, when Challis and two others came there and I signed a paper. I do not remember of Mrs. Maronde asking Porter Rightmire to come down and find out what I had signed."

"Q. Do you say now you did not say anything that night? A. No.

(It was admitted that paper signed that night was the power of attorney.)

"Q: Then you did not sign that paper? A. No.

"Q. You have talked to the attorneys about this suit, have you not? A. Not that I know of.

"Q. You have talked to Edgar Drake about it, have you not?   A. If 1 talked to anyone I would talk to him.

"Q. Did you talk to him any about it?   A. I never thought there would be any lawsuit.

"Q. You did not want to bring a lawsuit?   A. No."

At the time of the trial the plaintiff was eighty-six years old.   It is not improbable that her memory may not have been as good as when the will was executed, fifteen years before.   There was no showing that her husband intended to deceive her.   The will was drawn by a lawyer friend of the family. . He dictated it to a daughter of one of the defendants.   It is not claimed that he in any manner violated their trust and confidence.   The evidence discloses no concealment in the execution of the will.   Her husband signed the will, as she, in the presence of the various witnesses, signed the consent.   The circumstances justify the conclusion that she and her husband had talked over the matter involved and understood what they were doing.   The trial court considered all the circumstances, saw the witnesses and heard their testimony.   The various assignments of error need not be discussed in detail.   All have been considered, but we find nothing to justify any other conclusion than that reached by the trial court, or that would justify a reversal.

The judgment is affirmed.

JOHNSTON, C. J., not sitting.